IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

FILED
IN OPEN COURT

AUG 1 9 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA

    v.

DONNISHA TYVETTE GOODMAN
a/k/a "Lady Henny,"

    Defendant.

No. 4:24-cr-1

## STATEMENT OF FACTS

    The United States and the defendant, DONNISHA TYVETTE GOODMAN (hereinafter, "the defendant"), agree that, if this matter had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

    1.    The defendant was a "First Lady" for the regional set encompassing the Hampton Roads area of the Black P. Stone Nation ("BPSN") – a national street gang with different regional sets across the United States.

    2.    The BPSN, including its leaders, members, and associates, constituted an enterprise, that is a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.

    3.    BPSN constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

    4.    The BPSN utilized a hierarchy of membership with certain ranks. The regional leader for the east coast was called the "Krown Prinxe." The top female leader was called the "Krown Prinxess." The leader of a local gang subset, or "set," of a given city or similar geographic area was an "Ambassador" and reported to the Krown Prinxe. The Krown Prinxe answered only to the Chairman, who was located in Chicago.

5.     A "First Lady" was the highest female member of BPSN set.  The defendant held this position in Hampton Roads.  As a "First Lady," the defendant was under the direction and control of the male leadership as well as the Krown Prinxe and Krown Prinxess for the broader region.

6.     By joining the gang, BPSN members agreed to follow a number of rules, including attendance at monthly meetings, paying monthly dues, being responsive to communications by fellow and senior gang members, following orders, and being loyal to the gang.  Failure to follow the rules could lead to "violations," which could include punishments such as a twenty-one or thirty-one second "beating" or death.

7.     The purposes of BPSN included enriching the members and associates of BPSN through, among other things, narcotics distribution, and unlawful use of firearms; preserving and protecting the power, territory, and profits of BPSN through the use of intimidation, threats of violence, and violence, including assaults and murder; promoting and enhancing the enterprise and the activities of its leaders and members; keeping victims, potential victims, and community members in fear of the enterprise through violence and threats of violence; and providing financial support and information to gang leaders, members, and associates, including incarcerated individuals.

8.     Leaders, members, and associates of BPSN used intimidation, threats of violence, and violence, including assaults and murder, to preserve, expand, and protect BPSN's territory and activities, to promote and enhance its prestige, reputation, and position in the community, and to discipline gang members who had been disloyal or had violated gang rules.

9.     BPSN leaders and members attended regular gang meetings to discuss, among other things, the structure and organization of the gang, the history of the gang, BPSN leaders, and disciplining BPSN leaders, members, and associates who had violated gang rules.

10.     Leaders, members and associates of BPSN financed the enterprise through a variety of activities, including narcotics trafficking, robberies, and legitimate employment.

11.     Members of BPSN were required to pay monthly dues of $21 to a "kitty," or group fund, that was intended to be used for incarcerated gang members.

12.     Members of BPSN adopted some gang traditions associated with the Bloods, including wearing red, avoiding the use of the letter "c" in written communications, and attributing significance to the numbers 21 and 31.

13.     The BPSN enterprise, through its leaders, members, and associates, engaged in racketeering activity, specifically, narcotics trafficking and robberies, on behalf of the enterprise. The defendant says that she was unaware of robberies on behalf of BPSN.

14.     T.M. was the "Krown Prinxess" of a BPSN set in Virginia, which referred to itself as the "Vietnam Blakk5tone Gorillas Tribe." She resided in Richmond, Virginia.

15.     On or about May 6, 2023, the defendant conspired and joined together with four fellow BPSN gang members to kidnap and murder T.M.

16.     On May 6, 2023, at approximately 6:30 a.m., deputies with the York-Poquoson Sheriff's Office responded to the area of Old Williamsburg Road and Daniels Drive in York County and found the deceased body of T.M. She had been shot multiple times. Numerous shell casings with an "S&B" headstamp were found at the scene. She was found without shoes on, and she was not wearing a bra. She had visible injuries to her face.

17.     In the days leading up to May 6, 2023, the defendant and her coconspirators – Acacia Jackson, Hezekiah Carney, and Jamica Langley – determined that T.M. committed a gang infraction warranting a gang-related "beating."

18.     On the evening of May 4, 2023, the defendant and these three coconspirators drove from the Hampton Roads area to Richmond to carry out the "beating" of T.M.

19.     While en route to Richmond on or about May 4, 2023, the defendant and her coconspirators had a flat tire. This delayed their arrival at T.M.'s residence. They later reattempted the drive to Richmond after fixing the tire and arrived in the early morning hours of May 6, 2023.

20.     On or about May 5, 2023, at approximately 9:28 p.m., Jackson messaged T.M., "we otw to yah shii." At approximately 10:43 p.m., Jackson messaged T.M., "Her tire got flat," to which T.M. responded, "What's t? Kause this shit out of the blue. Don't beat around the bush. SAY WHAT IT ID AND WHAT IT AINT." Jackson replied, "Wym that's out of the blue fytb." The victim replied with the following emoji: " ." A few hours later, at approximately 1:15 a.m., Jackson messaged T.M., "Yoooooo," and T.M. responded "You n[*****] was supposed to dub me last night."

21.     At approximately 1:14 a.m. on May 6, 2023, the defendant and three coconspirators – Carney, Jackson, and Langley – arrived at T.M.'s residence located at **** Bethel Street in Richmond, Virginia.

22.     From approximately 1:14 a.m. until they departed T.M.'s residence at approximately 1:38 a.m., the defendant and her coconspirators conducted a gang-related "beating" of T.M. The Krown Prinxe of the gang, Carney, supervised while three female gang

members – Jackson, Langley, and the defendant – attacked T.M. for a specified period of time. T.M. suffered bruises to her face and body.

23.     At approximately 1:38 a.m., the defendant and her coconspirators left T.M.'s residence and went to pick up a fifth coconspirator, Jayquan Jones, who resided in the Jackson Ward area of Richmond.

24.     At approximately 2:22 a.m., the defendant discovered and sent a screenshot of Jackson's earlier communications with T.M. to Carney, including the message where T.M. sent a laughing emoji at being notified of the gang-related beating. This was viewed by the defendant and her coconspirators as a sign of disrespect to the gang.

25.     At approximately 2:28 a.m., the defendant and her coconspirators returned to T.M.'s residence and kidnapped her. Some of the coconspirators, including the defendant, were armed with firearms.

26.     When the defendant and her coconspirators arrived at T.M.'s residence, T.M. and her boyfriend were inside. The defendant and her female coconspirators attacked T.M. Jones and Carney brandished firearms and chased T.M.'s boyfriend upstairs, where he locked himself in an upstairs bedroom before jumping out the window to flee from the defendant and her coconspirators.

27.     After the boyfriend escaped, the defendant and her coconspirators took T.M. by force and against her will from her residence to the vehicle where they departed the area at approximately 2:34 a.m., holding T.M. in a black Hyundai Sonata.

28.     The defendant and her coconspirators used the black Hyundai Sonata bearing a Virginia license plate ending in 9340 registered to the defendant to transport T.M. from her residence in Richmond during the early morning hours of May 6, 2023.

-5-

29. The defendant and her coconspirators transported T.M. via Interstate 64 to a remote area of York County, Virginia, by Old Williamsburg Road, for the purpose of holding T.M. under force and false pretenses and killing her.

30. At approximately 3:29 a.m., the defendant and her coconspirators stopped at a 7-Eleven store. While in the vehicle of the parking lot, the defendant assaulted T.M. with a firearm by requiring her to perform a simulated sex act on the barrel.

31. At approximately 3:47 a.m., the defendant and her coconspirators removed T.M. from the vehicle and killed her, firing at least fourteen shots and striking T.M. eight times in the head, abdomen, back, buttocks, and legs.

32. The defendant and Jones directed T.M. to walk into the woods off Old Williamsburg Road.

33. As T.M. walked toward the woods, the defendant and Jones shot and killed T.M.

34. The Krown Prinxe, Carney, was the leader of the group who approved of and allowed the murder to occur in the manner and place in which it happened.

35. During the shooting, Carney stood to the rear of the Sonata and observed the defendant and Jones murder T.M.

36. The defendant and her coconspirators kidnapped and killed T.M. to punish her for disrespecting the gang.

37. Following the murder, the defendant and her coconspirators traveled back toward Richmond on Interstate 64. At approximately 4:32 a.m., they stopped at an Exxon gas station in Quinton, Virginia. During this period, the defendant transferred approximately $20 via the mobile payment service CashApp to coconspirator Jackson. Jackson then transferred

approximately $20 to coconspirator Langley. At approximately 4:38 a.m., Langley made a card purchase for $20.99, which is described on the statement as "NEW KENT EXXON."

38. The defendant put a note reminder in her phone in the hour prior to the murder to "turn your phone off" to evade law enforcement detection.

39. On May 7, 2023, the Norfolk Police Department located and stopped the afore-mentioned Hyundai Sonata. The defendant and two of her coconspirators, Jackson and Langley, were in the vehicle at the time. The vehicle was seized and searched pursuant to a warrant. Investigators recovered a 9 mm cartridge from the vehicle with the same "S&B" headstamp from casings found at the scene of T.M.'s murder. Cellular telephones were also recovered.

40. Investigators seized the defendant's phone on May 7, 2023, pursuant to a lawful warrant, and they later searched the device and recovered phone-location information. From 1:06 a.m. to 1:42 a.m. on May 6, 2023, the defendant's phone was in the vicinity of T.M.'s apartment on Bethel Street. From 1:45 a.m. to 2:23 a.m., the defendant's phone left that area and moved to the area of where Jones lived. From 2:25 a.m. to 2:36 a.m., the defendant's phone moved back towards T.M.'s residence. At 2:37 a.m., the defendant's phone left the area of T.M.'s residence and traveled eastbound on Interstate 64 towards York County. On May 6, 2023, between 3:30 a.m., and 3:40 a.m., the defendant's phone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, close to the 7-Eleven mentioned above. The phone then traveled down Yorktown Road and crossed into York County, to where Yorktown Road changes to Old Williamsburg Road. At 3:44 a.m., the defendant's phone was within .88 miles of where T.M. was murdered. From 3:50 a.m. to 3:56 a.m., the defendant's phone moved westbound on Interstate 64, away from the crime scene on Old Williamsburg Road. From approximately 4:30 a.m. to 4:33 a.m., the defendant's phone left the interstate and appeared to be in the vicinity of



the Exxon gas station mentioned above. From 4:43 a.m. to 4:54 a.m., the defendant's phone continued moving westbound on Interstate 64 into Richmond.

41.    The defendant and her coconspirators knowingly and intentionally used and discharged firearms during and in relation to the murder of T.M.

42.    The murder of T.M. was committed for the purpose of maintaining and increasing the defendant and her coconspirators' positions in BPSN, an enterprise engaged in racketeering activity.

43.    The defendant stipulates and agrees that she committed the acts described herein unlawfully, knowingly, and willfully, and without legal justification or excuse with the specific intent to do that which the law forbids, and not by mistake, accident or any other reason.  The defendant further acknowledges that the foregoing statement of facts does not describe all of her conduct relating to the offenses charged in this case, nor does it identify all of the people with whom she may have engaged in illegal activities.

<div style="margin-left: 40%;">
Jessica D. Aber<br>
United States Attorney
</div>

Date:    August 9, 2024                By:    _____

<div style="margin-left: 40%;">
Lisa R. McKeel<br>
D. Mack Coleman<br>
Assistant U.S. Attorneys<br>
Alyssa Levey-Weinstein<br>
Special Assistant U.S. Attorney
</div>



**Defendant's Signature**: After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, DONNISHA TYVETTE GOODMAN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: _8-15-24_                        _____

DONNISHA TYVETTE GOODMAN
Defendant

**Defense Counsel's Signature**: I am counsel for the defendant, DONNISHA TYVETTE GOODMAN, in this case. I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: _8/15/2024_                       _____

Lawrence Hunter Woodward, Jr.
Melissa E. O'Boyle
Counsel for the Defendant